No. 73.—MARTIN W. STAMPER, *et al.* plaintiffs in error, *vs.* JOHN B. GRIFFIN, defendant.

[1.] A Sheriff in his levy of land under a *fi. fa.* having misstated the number of the lot, can the error be corrected at Law ? *Quere.*

[2.] In the cross-examination of a witness, as to the contents of a letter or other paper written by him, with a view to impeach his credit, counsel will not be permitted to represent in the statement of a question, the contents of the writing, and to ask the witness whether he wrote it, without having first exhibited the letter itself to the witness.

[3.] The proper course is to put the writing into the hands of the witness, or to attach it to his interrogatories ; and to ask him whether it is his writing.

[4.] The rule in *Philips and Greenleaf,* that where evidence of contradictory statements by a witness, is offered by way of impeaching his veracity, general evidence that he is a man of truth and veracity, may be admitted, controverted and denied.

[5.] Evidence as to general character, can be introduced only where the general character is impeached; but not where the witness is discredited as to a particular fact.

[6.] The *judgment in Fain and Garthright,* (5 *Geo. Rep.* 6,) re-affirmed.

7.] A vendee who enters into possession of land, under a contract of purchase,

with an unconditional bond for titles, to be executed at a time stipulated, does not hold adversely as against the vendor, until the purchase money is paid.

Ejectment, in Talbot Superior Court. Tried before Judge IVERSON.

For the facts in this case, see the decision of the Court.

B. HILL and PATTERSON, for plaintiff in error.

E. WORRILL and WELLBORN, for defendant.

*By the Court.*—LUMPKIN, J. delivering the opinion.

An action of ejectment was brought against John B. Griffin, to recover lot No. 207, in the 22d district of what was formerly Muscogee, now Talbot County. There were two demises in the declaration, one in the name of Daniel Getler, the drawer, the other from Martin W. Stamper, the feoffee of Getler. The deed from Getler to Stamper, dated the 7th of October, 1847, being made while there was adverse possession to the premises, it was abandoned on the trial; and the only evidence relied on, in behalf of the plaintiff, was a grant from the State to Getler, for the lot, dated the 11th of September, 1832 ; the possession of the premises by the defendant at the commencement of the suit and the value of the annual rent.

The defendant pleaded the Statute of Limitations; and to support his defence, offered in proof, first, two Justice's Court executions, dated in April, 1845, with a return of " no personal property to be found" by the Constable, the 12th of October, 1845, together with a levy by the Constable, of the lot in question, dated the 21st of October, 1845. The *fi. fas.* were in favor of E. A. Hunter *vs.* William L. Glanton. The judgments upon which these executions issued were likewise tendered in evidence. Also a deed from the Sheriff to Griffin, for the land, dated the 3d of December, 1845.

The defendant next introduced a judgment in favor of James

A. Jeter *vs.* John Bush, and the execution issuing thereon, from the Superior Court of Talbot County, and dated the 17th of December, 1841, with a levy by James R. Giddens, Deputy Sheriff, as follows : " Levied the within *fi. fa.* on one lot of land, No. 207, in the 23d district of Talbot County." This levy is dated the 30th of July, 1842. The plaintiff's counsel objected to this testimony, on the ground that the levy was on a different lot of land from the one in controversy, namely, lot 207 in the 23d district, instead of lot 207 in the 22d district of Talbot County. The interrogatories of Giddens, the levying officer, who had gone out of office and left the State, were offered to prove the identity in the land, and the mistake in the entry of the levy. He swore that the land in dispute was the actual tract which was seized and sold by him.

This testimony was objected to, but admitted by the Court, and this constitutes the first exception in the bill.

A Sheriff's deed was offered from Thomas N. Robinson to William T. Horton, dated the 10th of November, 1842, reciting the sale under the *fi. fa.* of the true lot, and all other necessary facts, which went to show the regularity of the sale.

The defendant then produced and read in evidence a bond for titles, from David Getler to Joseph Morris, for the land, dated the 18th of November, 1837, whereby Getler obligated himself to make titles to Morris, Christmas ensuing. Rush was next sworn, who testified, that he bought the land from Morris, in 1838, and that he leased the land to one B. Boty, for five years, who went into possession and remained on the premises, till the beginning of the year 1843. Rush paid Morris a part of the purchase money at the time he bought, and the residue was collected by law the latter part of 1842. The testimony shows, indeed the fact is not denied, that Getler never has been paid for the land by Morris, nor by any body else. Morris admits that he did not pay him, but swears that Rush was to do so. Rush denies this.

B. Boty, who had occupied the land some five years, was examined three times by commission, by the plaintiff. The controversy was, whether he held under Getler or Rush. On two of his

examinations, he swore that he went upon the lot of his own accord, or as a squatter, and was to remain there by an agreement with Getler until Getler could sell the land; and that he took a lease from Rush, during this permissive tenancy under Getler. On the cross-examination, he was asked, with a view to impeach his credit, if he had not, on a day specified, written a letter to one Kellem, in which he stated, among other things, that he never saw Getler, nor any other man by that name on the land, while he occupied, or heard of his being there.

This testimony was objected to, on the ground that the letter itself should have been exhibited to the witness, and that he could not be called on to testify as to its contents. But the objection was overruled by the Court. And this is the second error assigned.

The witness was further asked, if he had not stated to certain persons who were named, to wit, J. A. Ellison and others, that he went on the land of his own accord; he answered that he had no recollection of ever having made any statements contrary to what he had sworn to in the interrogatories.

Ellison having proven, that witness had made the statement to which his attention was called, was interrogated by plaintiff's counsel, as to his knowledge of the general character of Boty for truth, and whether he would believe him on his oath; said that he thought that he would not. Plaintiff then offered one Hall, to support the general good character of the witness. But the Court held, that the witness having been discredited, by showing that he had made contradictory representations as to the facts in issue, it was not competent to sustain his credit by any inquiry as to his general good character. And this ruling constitutes the third error complained of.

The testimony being closed, the Court was asked to charge the Jury, that if Morris went into possession of the premises in dispute, under a bond for titles, and held possession under such bond, that such possession was not adverse; and that if Morris transferred the bond from Getler to himself, to Rush, who took and held possession under said bond and transfer; that then neither his possession, nor that of Boty, his tenant,

was adverse. That the possession of neither Morris nor Rush, under the facts and circumstances of the case, was adverse, unless the purchase money was paid to Getler, and until the same was paid; and that the Statute of Limitations did not commence running until that time.

All of which the Court refused; but on the contrary, instructed the Jury, that a purchaser of land with an unconditional bond for titles, holds the possession independently and in his own right, and not in subordination to the title of the vendor. That he is not a tenant at will, nor in any other form; nor is he liable to be ejected by the seller; nor does it affect the question, whether the purchase money be paid or not; that the possession of the vendee is, *eo instanti* the contract is executed, adverse to that of the vendor; and further, that if Boty took a lease from Rush, the transferree of Getler's bond to Morris, that his possession was adverse to that of Getler.

To all and each of which charges so given, as well as the refusal to charge as requested, the plaintiff by his counsel excepted.

The points to be discussed in this case, may be reduced to four.

*First.*—The admissibility of the testimony of the Sheriff, Giddens, to explain the mistake in the entry of the levy upon the *fi. fa.* under which the land was sold.

*Second.*—Whether it was competent to examine the witness Boty, as to the contents of the letter written by him to Kellem, without exhibiting the letter itself?

*Third.*—Whether, when a witness is discredited by showing that he has made contradictory statements, as to the facts about which he swears, his credit may be sustained by proof as to his general good character? and

*Fourth.*—Whether the possession of a vendee of land, under an unconditional bond for titles from his vendor, is adverse to the rights of the vendor, before the purchase money is paid.

[1.] We do not find it necesssary to decide the first question, under the view we have taken of this case. Had the levy been *defective* merely, not containing a sufficiently full description of

the property, it might perhaps be supplied by parol proof at law. But to allow an officer who has gone out of office, to show by his own testimony, and thus relieve himself from any personal responsibility which he may have incurred, that he seized and sold a totally different tract of land from that described in his levy, would be to establish a practice which would be liable to great abuse. That the error, if it be one, might be rectified by a proceeding in Chancery, instituted for that purpose, we have no doubt. We are not prepared to hold, however, that it may be done at Law.

[2.] As to the matter of the letter, the rule upon this subject is so clearly and fully stated by Mr. *Greenleaf,* that we deem it necessary only to recite the rule, as laid down by him. After referring to the general rule, that the credit of a witness may be impeached by proof that he has made statements out of Court contrary to what he has testified at the trial; and that in order to lay the foundation for this, it is necessary to ask him whether he has ever made such representations; the author adds: " A similar principle prevails in cross-examining a witness, *as to the contents of a letter,* or other paper written by him. The counsel will not be permitted to represent in the statement of a question, the contents of a letter, and to ask the witness whether he wrote a letter to any person with such contents or contents to the like effect, without having first shown to the witness the letter, and having asked him whether he wrote that letter, and his denying that he wrote it." 1 *Greenleaf's Ev.* §463.

[3.] And again, " a witness cannot be asked on cross-examination, *whether he has written such a thing,* stating its particular nature and purport; the proper course being to put the writing into his hands, and to ask him whether it is his writing." *Ibid,* §465.

By turning to the record containing the testimony of B. Boty, it will be found to be directly in the teeth of this rule. " On the cross-examination, the defendant asked the witness if he had not, on the 20th of December, 1848, written a letter to G. W. Kellem, in which he stated that he went on the land of his own

accord?    Also, if he did not write a letter of the same date  to the said Kellem, in  which he·stated, " it is said, that Daniel Getler was there while I was.   If he was, or  any other  man  by that name, I did not see him or hear of his being there."

Further comment upon this point would be useless.

[4.] After a  witness has  been  examined in  chief, his credit may be impeached in 'various modes, besides that of  exhibiting the impracticability of his story, by a cross-examination.

1. By disproving the facts  stated by him, by the  testimony of other witnesses.

2. By general evidence, affecting his credit for veracity.

3. By proof that he  has made statements out of  Court contrary to what he has testified to at the trial.

Here the  question is,  whether when a witness has been discredited, by proving that he made contradictory statements,  it is competent to support his testimony  by proof of  his general good character, for truth and veracity.   Mr. *Philips* asserts that it is reasonable to admit general  evidence, but cites no authority.   *Mr. Greenleaf* states the proposition in the very  language of  *Philips*, and in support of the proposition, refers to the case of *Rex vs. Clarke*, 2  *Starkie,* 241.    See 1  *Greenleaf*, §469.

[5.] Upon reference to this book, it will be found not to support the principle for which it is quoted.   In the case stated by *Starkie*, the witness was asked whether she had not been twice committed to Bridewell, and answered that she had.    This went to affect her general reputation; and the party who called her, was properly  allowed  to prove  that since  those  commitments, her character had been fair and good.   Mr. *Starkie* must be understood, therefore, as  meaning  only,  that where  the  questions put in the  cross-examination · and  answers, did  impeach the general character of the witness, the other party might rebut, by proving a general good character.

But it never was decided that if a  witness was  contradicted as to any fact of his testimony, either by his  own  declarations ·at other times or by other witnesses, evidence might be admitted to prove his general good character.   Suppose a witness contradicted himself on the stand, does  this give a  right to  intro-

duce evidence of general character ?   It was never so pretend-
ed.   Why any more should it be allowed, when he has contra-
dicted himself by making different statements, as to the facts ?

In *Russell vs. Coffin,* (8 *Pick. Rep.* 143,) this point was con-
sidered, and the practice, as stated in the text books, to which
I have referred, repudiated.   *Parker, C. J.* says, "if it were to
obtain, great delay and confusion would arise, and as almost
all cases are tried upon controverted testimony, each witness
must bring his compurgators to support him when he is contra-
dicted ; and indeed that it would be a trial of the witnesses, and
not of the action."

[6.] But the main and most grave question in this case is that
which is made by the charge of the Court, and its refusal to
charge.   It has received our attentive consideration.   It is this,
whether a party purchasing land, and going into possession un-
der an unconditional bond for titles, to be executed on a given
day, holds adversely as against the vendor ?

It is supposed that the case of *Fain vs. Gathright,* (5 *Geo.
Rep.* 6,) is an authority directly in favor of the affirmative of this
proposition. And it is due to candor to state, that it is not unlikely
that the Circuit Judge was misled by that case.   But the
contest there was not between the vendor and vendee, but be-
tween the *vendee* and a *third person.*   And with that explanation
and to that extent, we re-affirm the judgment there rendered.
It was right in the case made.

[7.] But as between vendor and vendee, we believe that the
same rule does not, and ought not to apply.   That the *quasi* re-
lation of landlord and tenant continues to exist, until the pur-
chase money is paid, notwithstanding the payment of the pur-
chase money is not made a condition precedent by the terms
of the express contract ; especially where, as in this case, the
time for making titles and the payment of the purchase
money is simultaneous.   For in such a case, while the stipula-
tions would seem to be mutual and independent, yet Equity
would treat them so far dependant, that a title would not be de-
creed before the price for the land was paid.

Each party, it is true, has his remedy at Law ; the vendor to sue

for his money, and the vendee to recover damages for a breach of the contract. Still the legal as well as the equitable title, is acknowledgedly in the vendor; and he retains it as security for his debt. Nor should he be divested of it, until he is paid. After payment is made, the legal title vests in the vendee, and from that time his possession becomes adverse.

We will not say that in such a case as this, where an unconditional bond for titles is given, the vendee might not, by an absolute sale of the property, or by some other overt act, so far repudiate the legal relation subsisting between him and the vendor, as to render his holding adverse, even before and without the payment of the purchase money. But unless, and until this is done, there would seem to be no inconsistency between his possession and his vendor's right.

In this case, Morris having merely transferred the land of Getler to Rush, and no part of the purchase money having ever been paid, by either of them or any one else, Rush stands in the same relation to Getler which Morris occupied, and no better. Nor was there any change in the position of the parties toward each other, until October or November, 1842, when the lot was sold as the property of H. Rush. And this we think, was the starting point of the Statute of Limitations; and being within seven years next preceding the commencement of the suit, the bar does not attach.

I would merely add, that nowithstanding the mistake in the levy, the deed under it being for the right lot, would constitute sufficient *color* of title to support the defendant's possession, had the requisite time elapsed.

Judgment reversed.